B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>Jeff Foster | DEFENDANTS<br>PNC Bank, National Association d/b/a PNC Mortgage |
|---|---|
| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br>William J. Factor and David Hassel, FactorLaw<br>105 W. Madison, Ste. 1500, Chicago, IL 60602<br>312-878-6976 | **ATTORNEYS** (If Known)<br>Marcel Charles Duhamel      John F. Sullivan<br>Joel P Fonferko<br>Matthew L. Hendricksen |
| **PARTY** (Check One Box Only)<br>■ Debtor          □ U.S. Trustee/Bankruptcy Admin<br>□ Creditor          □ Other<br>□ Trustee | **PARTY** (Check One Box Only)<br>□ Debtor          □ U.S. Trustee/Bankruptcy Admin<br>■ Creditor          □ Other<br>□ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
Claim Objections and Counterclaims for Affirmative Relief (11 U.S.C. § 506; 15 U.S.C. § 1681s-2; 15 U.S.C. §§ 1601 et seq.)

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
□ 11-Recovery of money/property - §542 turnover of property
□ 12-Recovery of money/property - §547 preference
□ 13-Recovery of money/property - §548 fraudulent transfer
■ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
■ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
□ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
□ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
□ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
□ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
□ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
□ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
□ 61-Dischargeability - §523(a)(5), domestic support
□ 68-Dischargeability - §523(a)(6), willful and malicious injury
□ 63-Dischargeability - §523(a)(8), student loan
□ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
■ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
□ 71-Injunctive relief – imposition of stay
□ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
□ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
■ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
□ 01-Determination of removed claim or cause

**Other**
□ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
■ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ■ Check if this case involves a substantive issue of state law | □ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| □ Check if a jury trial is demanded in complaint | Demand $ undetermined |

Other Relief Sought

**B1040 (FORM 1040) (12/15)**

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Jeff Foster | BANKRUPTCY CASE NO.<br>22-06377 | |
| DISTRICT IN WHICH CASE IS PENDING<br>Northern District of Illinois | DIVISION OFFICE<br>Eastern | NAME OF JUDGE<br>Goldgar |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br>December 23, 2022 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>/s/ William J. Factor | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| In re:<br><br>Jeff Foster,<br><br>      Debtor. | Chapter 11<br><br>Bankruptcy No. 22-06377<br><br>Judge A. Benjamin Goldgar |
| Jeff Foster,<br><br>      Plaintiff,<br><br>v.<br><br>PNC Bank, National Association d/b/a PNC Mortgage,<br><br>      Defendant. | |

**CLAIM OBJECTIONS AND**
**COUNTERCLAIMS FOR AFFIRMATIVE RELIEF**

For his Claim Objections and Counterclaims for Affirmative Relief against

PNC Bank, National Association d/b/a PNC Mortgage, Jeff Foster, as debtor and

debtor in possession ("Mr. Foster" or "Debtor"), by his attorneys, states as follows.

**<u>JURISDICTION</u>**

1.      This adversary proceeding arises in the debtor's chapter 11 bankruptcy

case pending before this Court as case number 22-06377 (the "Case").

2.      Pursuant to 28 U.S.C. § 1334(b), this Court has subject matter

jurisdiction over this proceeding, which is referred here pursuant to 28 U.S.C.

§157(a) and Local Rule 40.3.1(a) of the United States District Court for the

Northern District of Illinois.

{00231380 2}

3.      This is a core proceeding under 28 U.S.C. §§157(b)(2)(A), (B), (F) and (K), and this Court has the constitutional authority to enter final judgments and orders thereon.  In the event that it is determined that any portion of this proceeding is not a core proceeding or that a bankruptcy judge does not have the constitutional authority to enter final judgments in this proceeding, the Trustee consents, pursuant to 28 U.S.C. § 157(c)(2), to a bankruptcy judge hearing and finally determining the proceeding and entering all appropriate orders and judgments on a final basis.

4.      This Court is the proper venue for this adversary proceeding pursuant to 28 U.S.C. § 1409.

## PARTIES

5.      Plaintiff Jeff Foster filed a petition for relief under Chapter 11 of the Bankruptcy Code on June 6, 2022.  He has been operating as a debtor and debtor in possession.

6.      Defendant PNC Bank, National Association d/b/a PNC Mortgage is, on information and belief, a Delaware National Banking Association with its   principal place of business in Pittsburgh, Pennsylvania, which has offices and does business in Chicago, Cook County, Illinois.

7.      In or about 2007, PNC merged with National City Bank.  Before that merger, National City Bank acquired the assets of Mid-American Bank.  References herein to PNC or Defendant are inclusive of references to National City and Mid-American, except to the extent otherwise stated.

8.  On December 12, 2022, PNC filed the following proof of claims:

a.  Proof of Claim Number 10 (the "Fiesta Way POC") in the aggregate amount of $2,193,348.  The Fiesta Way Claim asserts the Debtor owes principal, interest and attorneys' fees and the sum of such amounts is secured by a mortgage on 56 Fiesta Way, Fort Lauderdale, Florida (the "Fiesta Way Property"); and

b.  Proof of Claim Number 11 (the "Kilpatrick POC") in the aggregate amount of $2,263,772 (the loan related to the Kilpatrick Home is sometimes referred to as the "HELOC").  The Kilpatrick POC asserts the Debtor owes principal, interest and attorneys' fees and the sum of such amounts is secured by a mortgage on 6201 N. Kilpatrick, Chicago, Illinois (the "Kilpatrick Property").

## BACKGROUND

9.  Mr. Foster's business focuses on buying residential real estate, rehabbing or upgrading the properties, and then brokering the sale of the properties or leasing the real estate that he owns.  The Debtor relies heavily upon access to credit markets.  Prior to his encounters with PNC, the Debtor had ready access to credit markets.  This access enabled the Debtor to accumulate many different properties, to earn a substantial income and to obtain a large net worth.  From 2000 to 2006, the Debtor had income of over $4,500,000 from his real estate businesses.

10.  Mr. Foster currently owns four (4) parcels of real estate.  The parcels consist of a residence at 6201 Kilpatrick Avenue in Chicago, Illinois (the "Kilpatrick Home"), a residence at 56 Fiesta Way in Fort Lauderdale, Florida (the "Fiesta Way Home"), and income-generating three-flat rental properties at 2156 N. Racine,

Chicago and 3716 N. Magnolia, Chicago. Mr. Foster divides his time between Florida and Chicago.

11.     PNC now holds the loans and mortgages on three (3) of the properties; Racine, Fiesta Way and Kilpatrick. PNC, either directly or through its predecessors, maliciously interfered with the Debtor's ability to conduct business commencing in 2005. As a direct result of PNC's involvement in the loans the Debtor owed in or about 2005, the Debtor's business was destroyed. As a direct result of PNC, the Debtor has not been able to purchase a new property since 2004 and has not been able to obtain a new loan since 2006, due solely to PNC's willful, malicious and intentional acts.

## THE KILPATRICK HOME

12.     In 1998, Mr. Foster purchased a residential property at 6201 N. Kilpatrick in Chicago's Sauganash neighborhood (the "Kilpatrick Property"). The original lender was MidAmerica Bank.

13.     The original loan with MidAmerica Bank for the Kilpatrick Property was refinanced with a line of credit from National City Bank, which at that time was operating as a separate lender. As explained elsewhere, National City swallowed MidAmerica and then PNC swallowed National City in 2009.

14.     In 2003, the Debtor refinanced the home equity line loan he had with National City with a home equity line of credit from MidAmerica of approximately $1.1 million.

15.     After the refinancing closed, a disagreement arose between National City and MidAmerica (not yet merged) regarding the payoff amount for the

National City loan. Due to National City's errors, the payoff amount submitted by the title company was about $8,800 less than the amount National City eventually believed it should have received. Thus, although the Debtor negotiated for the loan from MidAmerica to pay off the National City loan, that did not happen because National City erroneously requested the incorrect amount and made that known after the closing occurred.

16.    About four (4) months after the refinancing of the National City loan, Mr. Foster sought better financing through a new loan from a different lender in the normal course of his real estate business. He was rejected for that new loan. After investigating the matter further, he learned the denial was a result of National City, PNC's predecessor, falsely reporting that he was delinquent on the loan he believed he had paid in full when he refinanced it with the new loan from MidAmerica.

17.    National City fought with MidAmerica Bank as to what the payoff should have been. Mr. Foster was in the middle of that dispute and, more importantly, was the victim of that dispute inasmuch as National City reported to Credit Bureaus that he had "defaulted" on the loan that should have been paid off. The Debtor even offered to pay the $8,800 National City claimed he still owed, but they were unwilling to accept this resolution.

18.    As a result of this $8,800 dispute, Mr. Foster's credit score dropped into the mid 500's, and he was denied access to credit that was the lifeblood of his business. Eventually, Mr. Foster filed suit to force National City to address the problem. After a year and substantial legal fees, National City admitted the

mistake and finally corrected the error.  Mr. Foster spent approximately $100,000 to

remedy National City's disregard of its duties.

19.     In 2006, finally in a position to take advantage of historic pro-borrower

conditions, Mr. Foster concluded he could improve the terms of his loan with

MidAmerica by shopping around with other lenders.  Before doing so, however, he

contacted MidAmerica and asked if it would modify the loan to match terms offered

by other lenders by (1) lowering the interest rate for the loan and (2) eliminating

the "floor" that prevented the interest rate from going below 3.5%.

20.     MidAmerica agreed to modify the existing loan by changing the

interest rate to one point below the applicable prime rate and eliminating the floor

for the interest rate.

21.     Mr. Foster communicated to MidAmerica that the terms for the loan

modification were acceptable.  MidAmerica then agreed to prepare the documents to

memorialize these new terms.

22.     MidAmerica scheduled the closing on the loan modification for May 31,

2006, at the 6333 N. Milwaukee Branch.

23.     As instructed, Mr. Foster appeared at MidAmerica on May 31, 2006, to

close on the loan modification.

24.     When Mr. Foster arrived on May 31, 2006, he reviewed the documents

MidAmerica had prepared and saw that the interest rate floor had not been

removed.  The loan documents also did not have the correct interest rate of Prime -

1%.  These were material terms of the transaction.

25.     After Mr. Foster brought to the attention of MidAmerica the incorrect terms of the loan documents, he was advised they would be changed to conform with the terms to which the parties had agreed.  He also was asked to sign certain ancillary loan documents that did not need a notary or correction.  Mr. Foster thus did sign a Compliance Agreement on May 31, 2006.  He did not sign on May 31, 2006, either the note or the mortgage because these documents needed to be changed and because MidAmerica indicated it did not have the right personnel available to complete the closing that day.

26.     MidAmerica told Mr. Foster on May 31, 2006, that the closing was being rescheduled to June 5, 2006, and that he should return to the branch on that date.

27.     When Mr. Foster returned to the MidAmerica branch on June 5, 2006, he was again told that the personnel needed for the closing were not present that day.  Like before, the employee who specialized in loan closings was absent and so was the employee capable of notarizing loan documents. Mr. Foster did sign a Universal Residential Loan Application on June 5, 2006.

28.     At the attempted closing on June 5, 2006, MidAmerica indicated that Mr. Foster should return the next day to close the loan.  Mr. Foster did appear at the branch on June 6, 2006, but for the third time MidAmerica did not have the necessary personnel to complete the closing. Nonetheless, PNC sent Mr. Foster home with a "loan package" with new documents dated June 6th, which included a new draft of the same loan PNC alleges to have closed on May 31, 2006.

29.    After the failed June 6th closing, PNC did not set up another closing, and Mr. Foster never signed any additional documents. Mr. Foster continued to pay PNC as requested under this loan and the others in his portfolio with PNC. At some point Mr. Foster became aware that there was some change in the financing of the Kilpatrick Home, but because there was no apparent problem, he did not inquire further why the closing never occurred.

30.    On June 22, 2006, MidAmerica caused a mortgage on the Kilpatrick property to be filed with the Cook County Recorder's office as Document No. 0617308074 (the "**Unauthorized Mortgage**"). The Unauthorized Mortgage purports to bear Mr. Foster's signature and has a notary seal indicating it was signed on May 31, 2006.

## THE ANOMALIES IN THE ALLEGED LOAN DOCUMENTS

31.    PNC has largely relied upon the Unauthorized Mortgage to support its position that Mr. Foster signed the note and mortgage on May 31, 2006, and is thus bound by the terms of those documents.

32.    The critical loan documents prepared for the 2006 refinancing were never signed. As set forth below, numerous attempts were made to have a closing on the loan, but no closing occurred.

33.    Mr. Foster does not dispute that funds were provided to him as a result of the negotiations in May and June of 2006 or that he owes PNC some amount of the funds that remains outstanding.

34.    PNC, however, never presented to Mr. Foster—thus, Mr. Foster never signed—a promissory note and mortgage with PNC to define the terms of a loan and perfected mortgage in the amount advanced.

35.    PNC alleges there was a note and mortgage on the Kilpatrick Home, but neither the note nor the mortgage contain the applicable loan number, which would have been present to identify each of them if a closing had, in fact, occurred.

36.    PNC also—despite alleging a signed promissory note—does not seek in its proof of claim to assert the terms of the dubious note in its calculation of the amount owed on the Kilpatrick Home. Instead, they appear to apply terms from an attempted renegotiation from 2009.

37.    PNC, whether as National City or MidAmerica, has admitted numerous times that either they cannot find the original loan documents and that there never was a closing.

38.    Mr. Foster sent payments to PNC after the failed closing to protect against more derogatory credit remarks, but in fact did not know of the specific terms of the loan he was paying.

39.    Mr. Foster knew he did not sign the loan documents, so he asked repeatedly for the loan documents PNC claimed to govern the terms of the loan without success.

40.    It is apparent from PNC's behavior in not applying the loan terms it now says governed the loan throughout the history of the actual loan, that PNC at a minimum had questions about the loan and probably knew that the loan and mortgage were defective.

41.     PNC nevertheless chose to ignore this knowledge and reported to credit agencies that Mr. Foster had failed to pay the note as agreed *even though PNC showed it did not know what it agreed to either.*

42.     There are multiple facts that support the reasonable inference that the Unauthorized Mortgage is not a genuine document.

43.     First, MidAmerica generated a slew of other documents related to the home equity line of credit (the "HELOC") that are dated either June 5, 2006, or June 6, 2006, which is almost a week after PNC alleges the transaction closed. Some of these documents also have facsimile tag lines indicating they were transmitted on June 5, 2006.

44.     The existence of documents dated June 5, 2006, and June 6, 2006, permit the reasonable inference that the HELOC transaction did not close on May 31, 2006, and that Mr. Foster did not sign the mortgage or the note for the HELOC on May 31, 2006, or at any time.

45.     For example, on June 5, 2006, MidAmerica generated a Uniform Residential Loan Application with a date of June 5, 2006, related to the HELOC.  It makes no sense for MidAmerica to generate a loan application dated June 5, 2006, for a loan that allegedly closed on May 31, 2006.

46.     The documents that PNC has produced and that Mr. Foster has in his possession also reflect considerable anomalies related to the loan application that suggest MidAmerica (PNC) played fast and loose with the documents for the HELOC.  For example, the loan application dated May 31, 2006, is materially different from the loan application dated June 5, 2006.  It is signed only on the first

page by Mr. Foster, whereas other applications are signed only on the last page, as is customary.

47.    Next, MidAmerica generated on June 6, 2006, the following documents related to the HELOC:

    a.  a Signature / Name Affidavit,

    b.  a Personal Information Policy Disclosure,

    c.  a Consumer Loan Disbursement Instructions,

    d.  a Servicing Disclosure Statement, and

    e.  a Consumer Loan Closing Package Transmittal.

48.    Again, the HELOC could not have closed on May 31, 2006, given the undeniable fact that MidAmerica (PNC) generated and asked Mr. Foster to sign the foregoing documents on June 6, 2006.

49.    The documents that MidAmerica recorded also do not reflect the terms to which the parties agreed for the modification.  For example, the mortgage contains an interest rate floor of 4%, which was contrary to the agreement and the purpose of the modification.

50.    Additionally, the top of the first page of the mortgage document that MidAmerica recorded contains no loan number and unlike the other loan documents Mr. Foster executed with MidAmerica, it does not have his initials on each page.

51.    Although PNC engaged a handwriting examiner to opine that the signature on the mortgage aligns with exemplars of Mr. Foster's signature, the examiner cannot opine as to whether Mr. Foster's signature was lifted from another

document and placed on the mortgage.  This is not a difficult feat to accomplish.
No wet signature has ever been offered as proof.

52.    Additionally, the handwriting examiner asserts she examined the
original documents, but her report contains a copy of what appears to be the
promissory note with docketing information from 2013, thus indicating she
examined a copy that PNC filed with the District Court and not the original.

53.    Similarly, the document that purports to be the notarized mortgage
also appears to be a copy due to the background text images.  The purported
mortgage signature also is on a stand-alone page that does not follow the sequence
of the prior page.

54.    The District Court granted a summary judgment to PNC with respect
to its allegation that Mr. Foster had executed a mortgage to secure an obligation of
approximately $1,900,000, based on two facts: the mortgage document had a notary
seal attesting to the fact that Mr. Foster had appeared on May 31, 2006, and
executed the mortgage; and a report from a document examiner who opined that it
"was probable" the signature on the mortgage was Mr. Foster's.

55.    The District Court did not have before it, however, the fact that PNC
all but acknowledged there no note and mortgage on the property because PNC was
so uncertain of the loan *it never charged interest on it.*

56.    These are the same anomalies Mr. Foster pointed out to PNC long
before he was ever forced to defend against a foreclosure suit. He corresponded with
Nick Keleman of PNC on March 10, 2009, he advised that the closing for the 2006
loan never occurred, notwithstanding three attempts.

57.     MidAmerica's standard practices and procedures also obligated its employees to provide borrowers with a Good Faith Estimate and pro forma RESPA form prior to closing, as well as a closing package at or shortly after the closing, including a full Closing Statement, signed Loan Commitment, and completed final RESPA form.

58.     PNC's employees did not provide Mr. Foster with the pre-closing estimates or a closing package at or at any time after the HELOC was increased.

59.     MidAmerica's standard practices and procedures required borrowers to initial each page of all promissory notes when the borrower executes those documents.  Mr. Foster executed other loan documents with MidAmerica for other properties.  For those other loans.  MidAmerica told him to initial each page and to sign the last page.  The May 31, 2006, mortgage and promissory note from MidAmerica that PNC alleges Mr. Foster executed on May 31, 2006, were not initialed by Mr. Foster.

60.     Banks such as PNC develop and have in place consistent closing checklists they use to ensure completeness and accuracy of the loan documents they sign. Banks such as PNC either require initials on each page or do not, but they are consistent in their documentation requirements.

61.     Banks also put loan numbers on all loan documentation to identify what other documents are associated with the loan. The loan document does not appear on Mr. Foster's alleged note or mortgage.

62.     PNC was required to present a Truth in Lending Disclosure and have Mr. Foster acknowledge it, yet they have presented no such document.

63.    On information and belief, PNC stopped charging interest on the HELOC because, among other potential issues, it knew that it failed to provide the required Truth in Lending Disclosure and it was concerned that it would eventually be held liable for double the amount of the interest charged because of its failure.

64.    PNC was required to provide a settlement statement on form HUD-1 to show what funds were being made available and how those funds were used with respect to paying down any other mortgage on the Kilpatrick property. Mr. Foster never received or acknowledged this form nor has PNC produced one.

65.    Despite the oddities and unanswered questions surrounding the closing or lack thereof, Mr. Foster made all payments MidAmerica/PNC required from 2006 through 2009, to ensure he was protecting his credit.

66.    In early 2009, PNC agreed to a temporary two-year modification of the HELOC.  Under this short-term modification program, Mr. Foster's monthly payments were reduced to $3,005.50 for the next two years.

67.    As part of the conversations that culminated in the loan modification, Mr. Foster communicated with PNC's Mr. Nick Keleman.

68.    On March 10, 2009, Mr. Foster sent a letter to Mr. Keleman of PNC. The letter explained to Mr. Keleman that "[a]fter numerous attempts to go through the paperwork and three visits to the branch, the bank was not prepared" for the closing of the HELOC and when the documents were faxed to Mr. Foster "[t]hey were not signed by [him] or notarized."

69.    Mr. Foster advised PNC that he had not signed the mortgage or the note for the HELOC prior to any litigation related to the transaction.

70.     Mr. Keleman acknowledged that he did not see any loan documents related to the loan for the Kilpatrick Home but recommended that Mr. Foster make a request for the loan documents anyway.

71.     After Mr. Foster requested copies of the applicable loan documents, he received on March 24, 2009, a mortgage granted to MidAmerica for a home equity loan of $86,500 made in February of 2006 to someone named Jeffrey R. Foster.  The transmittal letter from National City, which was then the successor to MidAmerica, was from Jeff Haspas.  The transmittal letter advised that "[p]lease find Equity Line Documents" and attached documents for an Equity Line in the amount of $86,500.  The documents included with the transmittal letter were loan documents between Jeffrey R. Foster and Bridget M. Foster.

72.     When Mr. Foster explained to Mr. Keleman that Mr. Foster had not received the loan documents related to the HELOC, Mr. Keleman conceded PNC could not find any documents corresponding with a loan for the address of the Kilpatrick Home.

73.     On March 31, 2009, T.L. Bell, a vice president at National City, notified Mr. Foster that National City would consider the HELOC paid in full if Mr. Foster paid 70% of the balance on or before April 6, 2011.  Mr. Foster was unable to obtain the financing that would have allowed him to pay off this loan at a reduced amount.

74.     Thus, National City offered a concession on a loan it mishandled that Mr. Foster could not take advantage of because his credit had been ruined by other actions by the same bank's predecessor in misreporting a delinquency dating back to 2005. These disputed errors in his credit report would not be fixed until 2011, by

which time PNC had taken other actions to disparage Mr. Foster's credit. As alleged above, Mr. Foster eventually had to sue on this issue and as a result of his efforts, National City admitted the error was theirs.  Foster was unable to obtain the financing needed to accept the 70% settlement on the loan because the erroneous negative reports on his credit history rendered him unfinanceable.

75.    PNC next sent Mr. Foster a letter dated February 18, 2010, offering to accept in full payment 60% of the amount of the HELOC.  Again, Mr. Foster was unable to take advantage of this new offer because the errors and omissions in his credit report made Mr. Foster unfinanceable during the period in question.

76.    Mr. Foster made numerous attempts with other banks obtain financing to pay off this loan and be done with it. In each case, he had to explain the erroneous credit marks—to the extent he could make any sense of them—and assure prospective lenders the errors were being corrected.

77.    Mr. Foster completed a loan application with UBS and kept them updated on his progress getting PNC to remove the improper derogatory marks on his credit. While Mr. Foster was successful in removing many of these marks, he was unable to remove all of them before the deadline imposed by PNC. In addition, PNC continued reporting new derogatory marks, which ultimately caused the loan closing with USB to fail.

78.    Mr. Foster also worked with Republic Bank, Chase and Northern Trust, trying to explain that the disqualifying credit marks were errors that would be fixed. Republic Bank indicated the derogatory marks would prevent them from extending credit to Mr. Foster despite his explanations and evidence the marks

were in error. On information and belief, Chase Bank and Northern Trust declined to extend credit for the same reasons.

79.    While a July 28, 2011, letter from PNC did finally instruct the credit bureaus to remove all negative reporting on these loans, this was of no use because PNC at the same time refused to extend the deadline for settling the defective loan and Unauthorized Mortgage. As noted above, while PNC admitted its prior errors in reporting on Mr. Foster's creditworthiness, PNC continued to submit new ones.

80.    At the time of this Complaint, Mr. Foster is unsure what loan terms govern his loan with PNC. PNC, on information and belief, is also unsure what the governing terms are. The course of conduct between Mr. Foster and PNC indicates the terms are as stated in a letter confirmation of April 6, 2009.

81.    PNC has never sought to accrue interest in accordance with the documents—including the Unauthorized Mortgage—they alleged were signed on May 31, 2006.

82.    Further, the terms of the alleged May 31, 2006, loan and Unauthorized Mortgage are inconsistent with the proof of claim it filed in this action.

**PNC COVERS ITS TRACKS**

83.    Mr. Foster repeatedly brought to PNC's attention the fact that there were no signed loan documents related to the Equity Line.  In a letter dated November 16, 2009, Mr. Foster advised that "[a]s I have mentioned, my current equity line does not have any signed documents."

84.    Mr. Foster first learned PNC alleged he signed the note and mortgage when Randy Holland of PNC faxed documents to him on June 29, 2011.  Mr.

Holland then sent Mr. Foster another fax the next day with different documents. Mr. Foster then asked Mr. Holland to send hard copies of the loan documents PNC alleges he signed and after examining them Mr. Foster noted they, too, were different from the documents that had been faxed.

85.     The amounts shown for the payments did not match the terms of the 2006 refinance that Mr. Foster had been seeking, but had never closed, or the 2003 loan that had would have been paid off by the refinancing, and so Mr. Foster was not sure what the terms of the loan were.  He continued to make the requested payments, believing that doing so was a good faith way to both maintain a good relationship with PNC's predecessor MidAmerica and protect his credit.

86.     Although Mr. Foster timely made all required payments on the Equity Line, multiple times throughout the period from 2009 to 2012, PNC falsely reported to various credit bureaus that he was delinquent on the Equity Line.

87.     Mr. Foster informed PNC of each false report as he discovered them and demanded that PNC correct the information sent to the credit reporting agencies.

88.     Each time it was caught, PNC admitted that it had made false reports to the various credit reporting agencies regarding the payment status of the Line of Credit and promised to provide accurate reports in the future. However, PNC failed to correct these issues and continued reporting delinquencies, which they said they would fix only after a successful loan modification (similar to PNC's requirement that Mr. Foster agree to ratify the unsigned 2006 loan documents before agreeing to the same modification).

89.     When Mr. Foster talked to Randy Holland and Tom Bell about the adverse credit reports from PNC, they noted that the reports were from a different part of the company and suggested that Foster consider taking action against that division.

90.     In 2011, after the successful completion of the Short-Term Repayment Modification Program, Mr. Foster was working with PNC to refinance the loan for the Kilpatrick Home and had reached an agreement with PNC on the terms of the refinance, with the agreement providing for the monthly payments to remain around $3,000.

91.     That agreement, however, was never finalized because PNC kept including language in the new loan documents that required Mr. Foster to acknowledge that the pre-existing loan documents were the documents that PNC claimed he signed on May 31, 2006, at the non-existent closing.  The proposed modification also called for an increase in the monthly payment on the HELOC, contrary to the promises which had been previously made.

92.     As alleged above, PNC's conduct during the course of the Kilpatrick Home loan is inconsistent with any actual, executed loan on the property. As a result, Mr. Foster has had no choice but to pay what PNC asks with the hope—often dashed—that PNC will not further damage his credit.

**THE FIESTA WAY HOME**

93.     Mr. Foster divides time between the Fiesta Way and Kilpatrick Homes, He is not physically residing at either property at all times.  As a result, the loan

documents for the Fiesta Way Home include a "Second Home Rider" that makes clear that the home may not be occupied at all times.

94.     PNC began adding additional charges and misallocating payments on the Fiesta Way Home beginning in 2009.

95.     By 2011, PNC was incorrectly reporting the loan as delinquent.

96.     PNC reported the Fiesta Way Home was in foreclosure for all but three months from February 2014 and April 2022, even though this violated a tolling agreement in place.

97.     PNC's knowing mishandling of this loan and its reporting on it went beyond simple credit reporting issues. On January 18, 2012, when Foster was attempting to correct the numerous errors on his loans, PNC informed both Foster and the hazard insurer for the Fiesta Way Home that PNC considered the Fiesta Way Home to be vacant. PNC made this report to the insurer even though PNC received a report two days earlier stating that the property was in good condition and then refused to talk with Foster when he called, demanding instead that Foster make additional payments before it would talk with him about the vacancy issue.

98.     PNC also deliberately interfered with the property by causing the hazard insurer to cancel Foster's policy, which could have put the loan in default had Foster not been able to quickly restore coverage. On information and belief, an unknown PNC employee called the Broward County Appraiser's office about Foster's residency in Broward County. This call triggered an investigation by Broward County that endangered Foster's homestead exemption.

99.     From 2011 through 2012, PNC attempted numerous times to charge the Debtor amounts that were not owed with respect to the Fiesta Way property. For example, PNC alleged the Debtor needed to obtain wind-insurance for the property and because the Debtor did not have such coverage PNC was justified in obtaining the coverage at an annual cost of $37,730. The Debtor had been quoted no more than $6,000 for such coverage when he attempted to procure his own policy.

100.    On January 30, 2014, PNC filed a lawsuit against the Debtor in Broward County, Florida to foreclose the mortgage on the Fiesta Way property.  In the Florida Litigation, PNC asserted the Debtor defaulted on the Fiesta Way note and mortgage based upon his alleged failure to make the payments due after February 1, 2012.

101.    PNC dismissed the suit it filed against the Debtor in Broward County after the Debtor and PNC entered into a tolling agreement dated October 30, 2015. The stipulation of dismissal was filed on November 1, 2015.

102.    As a result of the tolling agreement, PNC promised it would *not file* any action to foreclose the mortgage on Fiesta Way until there was a final order in the suit between PNC and the Debtor in the Northern District of Illinois.  It also agreed it would not seek to enforce the obligations under the Florida note, other than in the litigation between PNC and the Debtor that was pending in the Northern District of Illinois.  *See infra.*

103.    Notwithstanding its dismissal of the mortgage foreclosure suit, PNC continued to make knowingly false reports to credit bureaus.  Beginning in

February 2014 through September 2017, PNC erroneously reported to the credit
bureaus that the property was in foreclosure.

104.   For three months only, October through December 2017, PNC reported
the account in good standing and paid as owed.

105.   Beginning January 2018, however, PNC again reported the loan in
foreclosure, despite the fact no foreclosure proceeding had been initiated.

106.   Despite its awareness of the tolling agreement, in January of 2018,
PNC reported to the credit bureaus "Foreclosure proceedings started."

107.   PNC knew without any doubt that the "foreclosure proceedings
started" was a false report. At the time PNC made the report with respect to the
Fiesta Way property, PNC had not "started" any foreclosure proceedings because it
was obligated not to do so by the tolling agreement it signed on October 30, 2015.

108.   PNC made this false report willfully, maliciously and with an intent to
harm the Debtor by interfering with his ability to obtain credit and resolve the
financial distress PNC caused originally.

109.   Once the Debtor discovered the false credit report that PNC made in
early 2018, counsel for the Debtor contacted counsel for PNC to advise them of the
issue.  The Debtor also advised the credit bureaus that the "foreclosure pending"
report from PNC was false. The credit bureaus then reached out to PNC, giving it
the chance to remove the admittedly false reports. Instead, PNC reasserted that the
property was in foreclosure.

110.   Repeatedly, the Debtor was advised by PNC that the false report about
a false foreclosure would be removed from his credit report.

111.    The false foreclosure report ultimately was removed in April of 2022, but the removal happened only after the Debtor hired a lawyer to address this issue and well after PNC's conduct destroyed Mr. Foster's credit for well over a decade.

112.    PNC's refusal to follow through on its promise to remove the false foreclosure report was but one instance of the malice it exhibited towards the Debtor.  Among other things, PNC was unwilling to countersign a joint payee insurance check of approximately $180,000 that was issued to repair flooding damage from a broken water pipe in the Fiesta Way property in 2019.  PNC also refused to discuss with the Debtor the mistakes they made in administering the escrow account for property the Debtor owned on Montana Street in Chicago.

## THE DISTRICT COURT SUIT

113.    In April of 2012, Mr. Foster filed a complaint against PNC in the United States District Court for the Northern District of Illinois, thereby commencing Case No. 12-cv-03130 (the "PNC Suit").

114.    The Third Amended Complaint (the "TAC") filed in the PNC suit alleged the following causes of action with respect to the HELOC:

      a.  Count One – Violation of the Fair Credit Billing Act.

      b.  Count Two -- Violation of the Fair Credit Reporting Act.

      c.  Count Three -- Breach of Contract.

115.    The TAC also alleged the following causes of action with respect to the Fiesta Way property:

      a.  Count Four – Breach of Contract

    b.   Count Five – Breach of Implied Duty of Good Faith and Fair

Dealing.

    c.   Count Seven – Fraud.

    d.   Count Eight – Unjust Enrichment and Disgorgement.

    e.   Count Ten – Breach of Fiduciary Duty.

116.   PNC also filed a counterclaim to obtain a judgment of foreclosure against Mr. Foster with respect to the HELOC and the amount owed under the documents for the Florida Property. As alleged above, PNC agreed not to commence a mortgage foreclosure suit with respect to the Fiesta Way property until after a final judgment in the PNC Suit.

117.   On May 24, 2019, PNC filed a motion for summary judgment with respect to, among other things, Counts 1, 2 and 3 of the TAC and its Counterclaim.

118.   On March 25, 2020, the District Court entered a Memorandum Opinion and Order with respect to PNC's motion for summary judgment (the "District Court Decision").

119.   The District Court Decision granted summary judgment to PNC on all of Mr. Foster's causes of action and on PNC's counterclaims pertaining to the loans on the Florida property and the HELOC.

120.   The District Court indicated its judgment with respect to the Fiesta Way Home was a final order and subject to appeal.

121.   With respect to the HELOC related to the Kilpatrick Home,  the District Court indicated that PNC should prepare and file a judgment of foreclosure and thus no final judgment was entered with respect to the HELOC.

122.    On April 22, 2020, Mr. Foster filed his notice of appeal with respect to the judgment entered for the Fiesta Way Home.

123.    On June 2, 2020, the District Court entered a judgment of foreclosure and sale with respect to the HELOC.

124.    During 2021, Mr. Foster and PNC engaged in settlement negotiations as part of the Seventh Circuit's mediation program.  Those negotiations did not result in a resolution of the matters under appeal.

125.    PNC scheduled a foreclosure sale with respect to the Kilpatrick Home for June 7, 2022.  The day before the foreclosure sale, Mr. Foster filed for bankruptcy relief, thereby commencing this case.

126.    Mr. Foster's bankruptcy schedules reflect that even if PNC successfully proves an entitlement to the full amount it claims under the HELOC and the Fiesta Way loan, he has equity in his property by more than $1,000,000.00.

127.    On October 18, 2022, the Seventh Circuit affirmed the grant of summary judgment with respect to the Fiesta Way Home.

## SUMMARY OF THE FALSE CREDIT REPORTING

128.    Mr. Foster refinanced a loan he had with National City with a new loan from MidAmerica (before they merged). National City failed to acknowledge the loan was paid in full after accepting payment for the full amount they asked for. Instead, they reported the loan as delinquent while National City and MidAmerica argued over what turned out to be a $8,800 book-keeping discrepancy that had nothing to do with the Debtor. Mr. Foster even offered to pay the $8,800 to protect

his credit rating while the banks figured it out, but National City refused the payment.

129.    Over the next seventeen (17) years PNC repeatedly and with reckless disregard for its duties continued to report false information about the Debtor's use of credit.  As recently as April of 2022, PNC continued to falsely report they had started a foreclosure suit for the Fiesta Way Home in Florida.

130.    That reporting was demonstrably false for many reasons, not the least of which is that in October of 2015, PNC and the Debtor entered into a forbearance and tolling agreement that barred PNC from commencing a foreclosure case on the Fiesta Way Home until entry of a final, non-appealable judgment in the PNC Suit.

131.    The false reporting was particularly impactful on the Debtor because his business relied upon using credit to purchase refinance real property and the negative reporting denied him access to this critical resource.

132.    PNC provided no less than 15 letters of apology and credit correction since 2006.  On October 20, 2009, National City acknowledged that they had falsely reported a delinquency for August and September 2009.  In a letter dated December 18, 2009, they did the same with respect to any delinquent reporting "through November 30, 2009." In July 2011, PNC sent a letter to credit bureaus requesting that they remove any negative reporting related to loans between the Debtor and PNC.

133.    The effect of the false reporting on Mr. Foster's business and cash flow was devastating.

134.   Mr. Foster would have had access to some credit, albeit at a more expensive rate, if only some of these derogatory marks were made on his credit reports. This would have made it expensive, but possible, for Mr. Foster to continue paying PNC even as it refused to correct its loan information.

135.   PNC, in fact, engaged in a course of fraudulent credit report so pervasive that Mr. Foster was ultimately cut off completely from the credit markets that otherwise would have allowed him to refinance his debts from available cash flow and to continue his real estate business.

## COUNT I:
## DECLARATORY JUDGMENT REGARDING
## STATUTE OF LIMITATIONS

136.   The Debtor restates as if fully set forth below each of the foregoing allegations relevant to this Count of the Complaint, as if fully set forth below.

137.   Pursuant to the Declaratory Judgment Act, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Bankruptcy Courts, as units of the district court, have the authority to issue declaratory judgments.

138.   Courts possess jurisdiction to issue declaratory relief where "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."

139.    On information and belief, there is substantial controversy between the Debtor and PNC of sufficient immediacy and reality to warrant issuance of a declaratory judgment, as set forth below.  On information and belief, PNC is likely to contend that some of the matters raised in this pleading are barred by an otherwise applicable statute of limitations.

140.    The filing of a proof of claim against a debtor equates to and is substantively identical to the filing of a complaint against a debtor for the amount set forth in the proof of claim.

141.    Section 5/13-207 of the Illinois Code of Civil Procedure provides, among other things, that "[a]  defendant may plead a set-off or counterclaim barred by the statute of limitation or the statute of repose, while held and owned by him or her, to any action, the cause of which was owned by the plaintiff or person under whom he or she claims, before such set-off or counterclaim was so barred, and not otherwise." 735 ILCS 5/13-207.

142.    Additionally, Bankruptcy Rule 3007(b) states that a "[a] party in interest shall not include a demand for relief of a kind specified in Rule 7001 in an objection to the allowance of a claim, but may include the objection in an adversary proceeding."  Fed. R. Bank P. 3007(b).

143.    PNC filed two complaints against the Debtor on December 12, 2022, when it filed the Fiesta Way POC and the Kilpatrick POC (the "Complaints").

144.    Under 735 ILCS 5/13-207 and Bankruptcy Rule 3007, any of the Debtor's claims against PNC are timely even if such claims would otherwise have

been barred by an otherwise applicable statute of limitations to the extent the Debtor has filed such claims independently.

WHEREFORE, on this Count of the Debtor's complaint, the Debtor requests the entry of an order declaring that each of the claims the Debtor has set forth in this Counterclaim are timely as a result of 735 ILCS 5/13-207 and Bankruptcy Rule 3007, and are not barred or precluded by any statute of limitation or repose, and for such other and further relief as is just and proper.

## COUNT II:
## BREACH OF CONTRACT

145.   At all times relevant to the allegations set forth herein, PNC made certain promises and undertook certain obligations to Mr. Foster with respect to the HELOC. These promises were made either expressly or in the form of the implied covenant of good faith and fair dealing.

146.   PNC promised Mr. Foster that it would apply all of the payments he made on the HELOC to principal or interest in accordance with the agreement between the parties.

147.   PNC also promised Mr. Foster that it would not report that he was delinquent in paying the HELOC if he had a good faith basis for believing all of the proper payments had been made and that it would notify Mr. Foster if a payment was late or delinquent.

148.   PNC also promised Mr. Foster that it would act in good faith and deal with him in a fair manner.

149.   PNC also promised Mr. Foster either expressly or as part of the covenant of good faith and fair dealing that PNC would not make false reports to credit reporting bureaus regarding the status of payments on the HELOC.

150.   PNC breached its obligations to Mr. Foster.  It breached its obligations by sending false and inaccurate information to credit reporting agencies in respect to the Line of Credit.  This happened beginning in 2011 and PNC continued to misreport Mr. Foster's account status through at least April 2018.

151.   Mr. Foster made the required monthly payments on the HELOC in the amounts PNC required.

152.   PNC's breaches of its obligations with respect to the HELOC damaged Mr. Foster.  Mr. Foster was damaged in that, among other things, PNC made false reports to credit reporting agencies regarding the status of the HELOC and the false reports caused a sizeable reduction in Mr. Foster's credit score.  The sizeable drop in Mr. Foster's credit score was the direct cause of his inability to obtain new loans and credit to pay PNC the amounts it was requesting in satisfaction of the HELOC.

153.   Mr. Foster's inability to obtain new loans to pay off the amount owed to PNC was a foreseeable consequence of PNC's breach of its contractual duties to Mr. Foster.  But for PNC's breach of its obligations, Mr. Foster would have been able to refinance the HELOC with a different lender and would been able to resume his profitable real estate business.

154.   PNC's breach of its obligations to Mr. Foster also precludes PNC from recovering under the HELOC.  A party who first breaches a contract forfeits the right to enforce the agreement against the nonbreaching party.

WHEREFORE,  on this Count of the Debtor's complaint, the Debtor prays that the Court enter judgment in his favor and against PNC, as follows:

(1)    Disallowing the Kilpatrick POC.

(2)    Awarding the Debtor damages for PNC's breach of its obligations related to the Kilpatrick Property, including attorneys' fees, consequential damages and any other amounts permitted under applicable law.

(3)      Awarding the Debtor such other and further relief as is just and proper.

## COUNT III:  CLAIM OBJECTION
### (Regarding the Kilpatrick POC)

155.   The Debtor restates and reasserts the allegations contained in this complaint as if fully set forth herein.

156.   PNC has alleged that it is the holder of the Unauthorized Mortgage on the Kilpatrick Property to secure the amount it alleges Mr. Foster owes on the HELOC.

157.   The Debtor denies that PNC is the holder of a mortgage on the Kilpatrick Property.  PNC is not the holder of a mortgage on the Kilpatrick Property in view of the material anomalies, inconsistencies and improprieties  related to the alleged loan closing, which lead to the reasonable inference that PNC knowingly

altered and recorded the Unauthorized Mortgage on the Kilpatrick Home and the related note without the authority to do so.

158.   Any amounts owed to PNC pursuant to the HELOC are unsecured debts that are not secured by any property in which he holds an interest.

159.   The Unauthorized Mortgage and the related note were altered and recorded to deceive the public to believe that Mr. Foster had executed such documents.

160.   The Unauthorized Mortgage was recorded with the intent of having third persons believe that it was executed by the Debtor, although it was not.

161.   The Defendant's mortgage claim against the Kilpatrick Home is unfounded, and it would be inequitable to enforce the mortgage claim.

162.   Section 506(a) of the Bankruptcy Code provides that a claim is secured only to the extent of the value of the holder's interest in the debtor's property.

163.   Because the Unauthorized Mortgage is not a valid mortgage, PNC is not the holder of a secured claim with respect to the HELOC and the Kilpatrick POC should be disallowed or allowed in a lesser amount as an unsecured claim.

164.   The Kilpatrick POC also should be disallowed, in part, because PNC is not entitled to recover any attorneys' fees and thus the amount owed should be reduced by the attorneys' fees of $353,214.94 that PNC is seeking to recover.

165.   Even if PNC has the right to recover attorneys' fees with respect to the Kilpatrick Property, the requested fees of $353,214.94, are neither reasonable nor supported by any documentation.

WHEREFORE, on this Count of the Debtor's complaint, the Debtor prays that the Court enter judgment in his favor and against PNC, as follows:

(1)     PNC does not hold a mortgage on the Kilpatrick Property.

(2)     Any amounts owed to PNC with respect to the Kilpatrick Property are unsecured.

(3)     PNC is not entitled to recover any attorneys' fees from the Debtor.

(4)     The fees and expenses that PNC is seeking to recover should be disallowed because such fees are not reasonable and such fees are not supported by any documents or other materials that provide a basis to award them.

## COUNT IV:  ESTOPPEL
### (Kilpatrick Loan)

166.    The Debtor restates and reasserts the allegations contained in this complaint as if fully set forth herein.

167.    PNC has not acted consistently with its assertion that the May 31, 2006, loan closing and Unauthorized Mortgage signing took place or that the terms of any of the documents it purports to be from this closing were ever in effect.

168.    PNC has made what it calls modifications to the terms of the loan, but has not reverted to alleged May 31, 2006, terms after the expiration of any temporary modification of terms.

169.    PNC, through its course of conduct since April 6, 2009, has acted as though the terms confirmed in the letter of that date controlled the terms of the unsecured loan formerly associated with the Kilpatrick Home.

170.    Mr. Foster has relied on the amounts requested by PNC as those necessary to keep his account current and not incur any derogatory credit reports from PNC.

171.    Given Mr. Foster's history of negative credit reporting from PNC and its predecessor entities MidAmerica Bank and National City Bank, Mr. Foster's payment of these amounts was in reasonable reliance on the assumption that PNC was requesting the amounts it actually believed due under the terms of the then-existing loan.

WHEREFORE,  on this Count of the Debtor's complaint, the Debtor prays that the Court enter judgment in his favor and against PNC, as follows:

(1)     PNC is estopped from asserting the terms of the purported May 31, 2006, loan documents in support of any claim or defense in this action, including in the determination of breach, amount owed or damages.

(2)     The Kilpatrick POC is disallowed.

### COUNT V:  CLAIM OBJECTION
### (Regarding the Fiesta Way POC)

172.    The Debtor restates and reasserts the allegations contained in this complaint as if fully set forth herein.

173.    The Fiesta Way POC seeks to recover $2,193,348.86.  This is comprised of principal of $1,095,615.54, interest of $459,382.47, unpaid advances of $596,135.54, fees and costs of $384,002.62, less total funds of $341,787.30.

174.   On March 25, 2020, the District Court entered summary judgment of $1,412,242.85 (the "Summary Judgment") in favor of PNC with respect to the Fiesta Way Property.

175.   On October 18, 2022, the Seventh Circuit affirmed the Summary Judgment.

176.   The Summary Judgment of $1,412,242.85 limits the amount owed to PNC with respect to the Fiesta Way loan and property.  The additional amounts requested in the Fiesta Way POC should thus be disallowed.  This includes the interest of $459,382.47, the unpaid advances of $596,135.54, and the attorneys' fees and costs of $384,002.62.  The entry of a final judgment that does not include such amounts precludes PNC from seeking to recover such amounts in its proof of claim.

177.   Furthermore, to the extent PNC were able, for the sake of argument, to recover additional sums, the sums they seek from the Debtor are neither documented nor reasonable.  This includes the attorneys' fees and costs of $384,002.62 and unpaid advances of $596,135.54.

WHEREFORE,  on this Count of the Debtor's complaint, the Debtor prays that the Court enter judgment in his favor and against PNC, as follows:

(1)      Disallowing that portion of the Fiesta Way POC that exceeds the summary judgment amount of $1,412,242.85.

(2)      Disallowing any portion of the Fiesta Way POC that seeks to recover attorneys' fees, unpaid advances and any other amounts in excess of $1,412,242.85.

**COUNT VI:**
**(FCRA § 1681 Violations – Kilpatrick Loan)**

178.    Plaintiff restates and reasserts the allegations contained in this

complaint as if fully set forth herein.

179.    Section 1681s-2 of the Fair Credit Reporting Act addresses the varied

"responsibilities of furnishers of information to consumer reporting agencies."  15

U.S.C. § 1681s-2.

180.    Among other requirements, Section 1681s-2(a) directs that "[a] person

shall not furnish any information relating to a consumer to any consumer reporting

agency if the person knows or has reasonable cause to believe that the information

is inaccurate." *Id.*

181.    The term "reasonable cause to believe that the information is

inaccurate" in Section 1681s-2(a) "means having specific knowledge, other than

solely allegations by the consumer, that would cause a reasonable person to have

substantial doubts about the accuracy of the information."  *Id.* at 1681s-2(d).

182.    Section 1681s-2(a)(2) provides that "a person who—

**(A)**  regularly and in the ordinary course of business furnishes information to

one or more consumer reporting agencies about the person's transactions

or experiences with any consumer; and

**(B)**  has furnished to a consumer reporting agency information that the

person determines is not complete or accurate, shall promptly notify the

consumer reporting agency of that determination and provide to the

agency any corrections to that information, or any additional

information, that is necessary to make the information provided by the

person to the agency complete and accurate, and shall not thereafter
furnish to the agency any of the information that remains not complete
or accurate."

183.   PNC knew or reasonably should have known that it did not have a
note secured by a mortgage on the Kilpatrick Home as a result of the May-June
loan negotiations.

184.   PNC knew or reasonably should have known there were no signed
agreements for the loan.

185.   PNC knew, or reasonably should have known, that there was
uncertainty and confusion regarding the amount owed on the HELOC and that the
amounts it was demanding from the Debtor were based not on what the Debtor
agreed to pay, but on what PNC determined it was owed.

186.   Based upon what PNC determined it was owed, PNC made false
reports to credit reporting agencies when it unilaterally determined that the
amount it believed it was owed had not been paid.

187.   It was therefore inaccurate for PNC to report information that the loan
was not paid as agreed, when it was aware no agreement was made.

WHEREFORE, on this Count of the Debtor's complaint, the Debtor prays
that the Court enter judgment in his favor and against PNC for:

(1)   Compensatory and punitive damages allowable under applicable law,

(2)   Punitive damages to the extent warranted;

(3)   Such other amounts as are just and proper.

## COUNT VII:
## (FCRA § 1681 Violations – Post-2018 Fiesta Way Loan)

188.   Plaintiff restates and reasserts the allegations contained in this complaint as if fully set forth herein.

189.   Section 1681s-2 of the Fair Credit Reporting Act addresses the varied "[responsibilities of furnishers of information to consumer reporting agencies." 15 U.S.C. § 1681s-2.

190.   Among other requirements, Section 1681s-2(a) directs that "[a] person shall not furnish any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the information is inaccurate." *Id.*

191.   The term "reasonable cause to believe that the information is inaccurate" in Section 1681s-2(a) "means having specific knowledge, other than solely allegations by the consumer, that would cause a reasonable person to have substantial doubts about the accuracy of the information." *Id.* at 1681s-2(d).

192.   PNC had actual knowledge that it did not commence a foreclosure suit against the Debtor with respect to the Fiesta Way property after November 2015, and that no such proceeding had been pending against the Debtor after November 10, 2015.

193.   PNC changed its reporting on the loan to "paid as agreed" from October through December of 2017.  Starting January 2018, however, PNC once again reported the Fiesta Way Property as in foreclosure, which at that point and others, was in violation of the tolling agreement it signed with Mr. Foster.

194.    PNC knew that it reported inaccurate information to the credit
bureaus when it advised them in early January 2018, that it commenced a
foreclosure suit against the Debtor with respect to the Fiesta Way Property.

195.    PNC had reasonable cause to believe that the information it provided
to the credit bureaus in early January 2018, related to the Fiesta Way Property was
false.

196.    Section 1681s-2(a)(2) provides that "a person who—

**(A)**    regularly and in the ordinary course of business furnishes information to
one or more consumer reporting agencies about the person's transactions
or experiences with any consumer; and

**(B)**    has furnished to a consumer reporting agency information that the
person determines is not complete or accurate, shall promptly notify the
consumer reporting agency of that determination and provide to the
agency any corrections to that information, or any additional
information, that is necessary to make the information provided by the
person to the agency complete and accurate, and shall not thereafter
furnish to the agency any of the information that remains not complete
or accurate."

197.    PNC determined, or reasonably should have determined, that the
information it reported after January 1, 2018, regarding the Fiesta Way property
was "not complete or accurate."

198.    PNC failed to comply with its obligations under the FCRA because it
did not take the steps required by Section 1681s-2(a)(2) when it determined, or

should have determined, that the information it reported regarding Fiesta Way "was not complete or accurate."

199.  PNC and its counsel refused to address the false information PNC provided to the credit reporting agencies and to communicate with the Debtor regarding such information.

200.  Because PNC refused to address the false information that it lodged on the Debtor's credit report, the false information remained on the report each month from January of 2018 through April of 2022.  Each time the false information remained on the credit report represents a false statement and representation by PNC.

201.  PNC's knowledge and awareness that a foreclosure proceeding had not been commenced against the Debtor in January 2018, plus its failure to take reparative or remedial measures, plus its long history of making false reports regarding the Debtor's use of credit, plus its conduct in connection with the closing on the HELOC, plus the conduct of National City in 2005 related to the refinancing of the HELOC, individually and collectively render PNC's conduct in 2018 and thereafter willful and malicious.

WHEREFORE, on this Count of the Debtor's complaint, the Debtor prays that the Court enter judgment in his favor and against PNC for:

(1)    Compensatory and punitive damages allowable under applicable law.

(2)    Punitive damages to the extent warranted.

(3)    Such other amounts as are just and proper.

## COUNT VIII:
## (Tortious Interference with Business Expectancy)

202.    Plaintiff restates and reasserts the allegations contained in this complaint as if fully set forth herein.

203.    The Debtor had a reasonable expectancy that he would be able to enter into a new contractual relationship with a lender to refinance or payoff the amounts owed to PNC on the Fiesta Way Property and the HELOC.

204.    PNC knew that the Debtor expected to enter into a new financing relationship to pay off the amounts owed to PNC.

205.    PNC intentionally and unjustifiably interfered with the Debtor's expected refinancing by making false reports to credit bureaus.

206.    The Debtor was damaged by PNC's interference with the Debtor's efforts to refinance amounts owed to PNC.

WHEREFORE,  on this Count of the Debtor's complaint, the Debtor prays that the Court enter judgment in his favor and against PNC for the following:

(1)      Compensatory damages in an amount to be determined at trial;

(2)      Punitive damages in an amount to be determined at trial;

(3)      Whatever other amounts that are properly awarded as a result of the conduct alleged in this Count; and

(4)      Attorneys' fees, costs and expenses in an amount to be determined.

## COUNT IX:
## (SLANDER OF TITLE)

207.   Plaintiff restates and reasserts the allegations contained in this complaint as if fully set forth herein.

208.   Defendant altered the Unauthorized Mortgage without any authority from Plaintiff.

209.   The Unauthorized Mortgage falsely purported to be executed by Plaintiff.

210.   Defendant knew the Unauthorized Mortgage falsely claimed to be executed by Plaintiff when Defendant recorded it.

211.   Defendant published the Unauthorized Mortgage by recording it with the Cook County Recorder of Deeds with the knowledge that it contained the false statement it was executed by Plaintiff.

212.   Defendant had no reasonable grounds to believe that Plaintiff had executed the Unauthorized Mortgage when Defendant recorded and published it.

213.   Defendant's recording of the Unauthorized Mortgage cast doubt on the extent of Plaintiff's property interest in the Kilpatrick Home, and Defendant intended it to cast doubt on Plaintiff's property interest or it is reasonable for those reviewing the Unauthorized Mortgage to understand it to cast doubt on Plaintiff's property interest.

214.   The publication through recordation of the Unauthorized Mortgage, which contained the false statement it was executed by Plaintiff, disparaged Plaintiff's claim to title on the Kilpatrick Home, resulting in substantial damages to Plaintiff.

215.    Plaintiff has suffered pecuniary losses and damages from the unauthorized encumbrance on the Kilpatrick Home including the inability to sell the property or use the property as security for financing.

WHEREFORE, Plaintiff respectfully requests this Court enter judgment in his favor and against Defendant on this Count of his Counterclaim in at least the following sums:

(1)    Damages in an amount to be determined at trial for injury caused by the publications of the false statements, including costs and attorneys' fees.

(2)    Punitive damages, to the extent appropriate.

(3)    Whatever other relief is just and warranted.

## COUNT X:
## (FRAUD – KILPATRICK PROPERTY)

216.    The Debtor restates and reasserts the allegations contained in this complaint as if fully set forth herein.

217.    Under Illinois law, any scheme, device or artifice, which is designed or used to cheat or deceive another is fraud.

218.    Under Illinois, the failure to disclose material information when one is under a duty to disclose such information is fraud.

219.    Defendant used the altered Illinois Note and Unauthorized Mortgage to cheat and defraud Plaintiff out of an interest in the Kilpatrick Home by recording and publishing the Unauthorized Mortgage.

220.    Plaintiff suffered damages as a result of Defendant's fraudulent conduct related to the Unauthorized Mortgage.

221.    PNC had a duty to disclose to the Debtor the events and circumstances related to the HELOC, including the fact that proper documentation was not provided, that the closing did not occur on May 31, 2006, June 5, 2006 or June 6, 2006, and that there were numerous defects and defenses to the enforcement of the HELOC.

222.    In view of PNC's duty to disclose, PNC's failure to disclose the true events and circumstances related to the HELOC constitutes fraud.

WHEREFORE, The Debtor respectfully requests this Court enter judgment in his favor on this Count of the Complaint, as follows:

(1)    An amount to be determined at trial for Defendant's fraudulent course of conduct depriving Plaintiff of an interest in his property, including costs and attorneys' fees

(2)    Punitive damages to the extent warranted.

(3)    Whatever other relief is just and warranted.

## COUNT XI:  TRUTH IN LENDING ACT
### (15 U.S.C. §§ 1601 *et seq.*)

223.    The Debtor restates and reasserts the allegations contained in this complaint as if fully set forth herein.

224.    PNC extends credit in the ordinary and regular course of its business.

225.    The loans PNC made to the Debtor on the Kilpatrick Home were purportedly secured by real estate. 15 U.S.C. § 1502(3).

226.    The Truth in Lending Act ("TILA") requires a disclosure statement *prior to* the issuance of credit, 15 U.S.C. 1637(a).

227.    PNC was obligated to provide Debtor with a TILA disclosure prior to the alleged May 31, 2006 loan closing (*id*.) and each time it changed the rate on his loan. 15 U.S.C. 1637(b).

228.    PNC failed to provide the Debtor with the required TILA disclosures. On information and belief, PNC did not provide the Debtor with any TILA disclosures.

229.    The Debtor has been damaged by PNC's failures to provide the required disclosures and by PNC's failure to follow proper protocols for closing a home equity loan financing.

WHEREFORE,  on this Count of the Debtor's complaint, the Debtor prays that the Court enter judgment in his favor and against PNC, awarding the Debtor:

(1)        All damages to which he is entitled under TILA, including statutory damages based on his finance charges and his attorneys' fees;

(2)        Any other relief that is just and proper up to and including recission.

## COUNT XII:  CONSUMER FRAUD
## (ILLINOIS CONSUMER FRAUD ACT)

230.    Plaintiff restates and reasserts the allegations contained in this

complaint as if fully set forth herein.

231.    Pursuant to the Illinois Consumer Fraud Act (the "ICFA") 815 ILCS

505/1, et seq.,

> Unfair methods of competition and unfair or deceptive
> acts or practices, including but not limited to the use or
> employment of any deception, fraud, false pretense, false
> promise, misrepresentation or the concealment,
> suppression or omission of any material fact, with intent
> that others rely upon the concealment, suppression or
> omission of such material fact, or the use or employment
> of any practice described in Section 2 of the "Uniform
> Deceptive Trade Practices Act" . . . in the conduct of any
> trade or commerce …"  815 ILCS 505/2.

232.    PNC's unfair and deceptive practices include:

a.  In 2003, PNC sent a payoff letter to MidAmerica with the

incorrect amount and by failing to take responsibility for its error damaged Mr.

Foster's credit for over three years;

b.  In 2006, PNC manufactured documents and engaged in other

fraudulent conduct to cover up for its failure to properly close the HELOC loan

transaction.

c.  From 2006 through 2011, PNC made not less than twenty-seven

false reports to credit reporting bureaus regarding the status of Mr. Foster's

payment on the HELOC and when informed of such false reports, did not act in a

responsible manner to correct any damage or to prevent future infractions.

d.  In 2011, PNC attempted to pressure Mr. Foster to concede he signed the HELOC Loan Documents as a precondition to entering into a new loan modification.

e.  In 2011, PNC also used *post hoc* ratification of the purported May 31, 2006 documents as a precondition of correcting admitted errors in PNC's credit reporting.

f.  PNC failed to provide the Debtor with the required Truth-in-Lending Act disclosures.

g.  PNC misrepresented and concealed, and continues to misrepresent and conceal, the conditions and events related to the HELOC loan.

h.  PNC abused its power to report information to credit bureaus to exert improper pressure upon the Debtor, to coerce him to perform actions and to cause him damage.

233.   PNC's conduct is unfair and deceptive as those terms are defined and given meaning under the ICFA.

234.   PNC's conduct with respect to the false reporting under the HELOC and the Fiesta Way false foreclosure also is immoral, unethical and oppressive, offends public policy and causes substantial injury to consumers.

WHEREFORE, on this Count of the Debtor's complaint, the Debtor prays that the Court enter judgment in his favor and against PNC, for:

(1)    Compensatory damages in an amount to be determined at trial.

(2)    Punitive damages in an amount to be determined at trial.

(3)        Attorneys' fees incurred.

(4)        Any other amounts that are proper under the Consumer Fraud and

Deceptive Practices Act.

Respectfully submitted,


By: /s/William J. Factor

Dated:  December 23, 2022

ATTORNEYS FOR DEBTOR/COUNTERCLAIMANT
JEFF FOSTER

William J. Factor (6205675)
FACTORLAW
105 W. Madison Street, Suite 1500
Chicago, IL 60602
(312) 878-6146
wfactor@wfactorlaw.com